NAT WISSMAN V. HARRY BOUCHER ET AL.

No. A-2913. Decided May 30, 1951.
Rehearing overruled June 27, 1951.
(240 S. W., 2d Series, 278.)

*Henry Klepak* and *John P. Koons,* both of Dallas, for peti-tioners.

The Court of Civil Appeals erred in holding that there was no loss of profit to the petitioner. Grand Prairie Gravel Co. v. Joe B. Wills Co., 188 S.W. 680; Bagby v. Hodge, 297 S.W. 882; 17 C.J. 785.

*J. Willard Bragg* and *Charles H. Storey,* both of Dallas, for respondents.

The Court of Civil Appeals correctly held that the evidence in the record showed no loss of profits to the petitioner by rea-son of respondent's selling the fishing poles, which they manu-factured, but that uncontroverted evidence showed that re-spondents did suffer damage and were entitled to recovery there-for by reason of the temporary injunction procured by plaintiff. Page v. Hancock, 200 S. W. 2d 421, error refused, n.r.e, 145 Texas 693; Southwest Battery Co. v. Owen, 131 Texas 423, 115 S.W. 2d 1097; Galveston Ry. Co. v. Miller, 38 S. W. 1132.

MR. JUSTICE GARWOOD delivered the opinion of the Court.

In the District Court at Dallas, the plaintiff Wissman sought damages and an injunction against defendants Boucher and Phillips, machine shop operators and small manufacturers, for misappropriation of his alleged novel idea of a metallic fishing rod that would collapse into one piece and thus serve also as a walking stick. Upon furnishing bond for damages, pursuant to Rule 684, Texas Rules of Civil Procedure, he was granted a temporary injunction restraining the defendants from manu-facturing for sale a pole such as that described by him. Upon appeal of the defendants from that proceeding, the Court of Civil Appeals dissolved the temporary injunction for reasons going to the essence of the plaintiff's claim as then presented. 206 S. W. 2d 101. Petition for writ of error to review that judgment was by this court "Refused. No reversible error." (146 Texas 673.) The case was thus left pending trial on the merits. Before trial, the plaintiff amended so as to allege an oral contract made with the defendants, in connection with the manufacture by the latter of some sample poles for the plain-

tiff, whereby the defendants agreed not to produce the pole for sale except for the plaintiff. The defendants in turn filed a cross action for damages on the plaintiff's temporary injunction bond consisting of lost profits, which they would have made by manufacturing and selling a pole similar to the plaintiff's pole during the injunction period and but for the injunction. On trial to a jury, the evidence included testimony of negotiations between the parties as to the defendants making for the plaintiff both sample poles and large amounts of poles for sale to the public, as well as testimony regarding the abovementioned agreement of the defendants. There was also proof as to the alleged damages of the plaintiff and those of the defendants arising from the temporary injunction.

The jury found the defendants to have made the agreement asserted by the plaintiff; that this promise was not made in consideration of the plaintiff constituting the defendants in effect his exclusive manufacturing agents for the poles; that the defendants engaged in "unfair competition" with the plaintiff; and that the plaintiff was damaged in the sum of $4200. It also found that, but for the injunction, the defendants would have manufactured and sold poles for their own account at a profit to them of $15,000, during the period of the injunction. The trial court on these findings awarded the plaintiff damages of $4200 and a permanent injunction, denying the defendants relief on their cross action on the injunction bond.

The defendants again appealing, the Court of Civil Appeals reversed the judgment of the trial court and rendered judgment (a) denying all relief to the plaintiff and (b) allowing the defendants recovery on the bond. 233 S. W. 2d 314. In connection with (b) the appellate court, on the theory that the finding of $15,000 as lost profits of the defendants was excessive and would have had to be the subject of remittitur had the trial court held for the defendants, rendered judgment for $5000, subject to remanding the case if such "remittitur" of $10,000 should not be duly agreed to by the defendants. The latter did so agree, and the only party complaining here is the plaintiff.

On the appeal from the temporary injunction, the court below, while resting its opinion largely on the absence of a "trade secret" characteristic of the plaintiff's pole, commented also on the lack of any contract as a possible basis of the plaintiff's claim. In its decision now under review, it adhered to its earlier conclusions as to the question of trade secret. It held further that the agreement, found in rather general terms by the jury to

exist, was yet conclusively shown to be based on the contingency of "production" orders from the plaintiff, which admittedly were never given.

■ We see no important reason to recede from our earlier view and that of the Court of Civil Appeals to the effect that there was no "trade secret" involved, nor is it strongly contended that we should. There is no patent or claim of patentable device in respect of the pole as made by the plaintiff, and while the evidence is as confused as it is abundant, it seems clear enough that, even making the doubtful assumption of novelty in the plaintiff's idea, his pole is based on familiar mechanical means and principles that are quite obvious to and easy to imitate by any reasonably experienced machinist that might see one for the first time or purchase it on the open market. Under these latter circumstances, the exposure of the device to the public by advertisement or sale definitely operates to destroy any legal protection the claimed originator might otherwise assert on the basis of a trade secret. "The subject matter of a trade secret must be secret. Matters of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret." Restatements, Torts, Ch. 36, p. 7. The plaintiff, either directly or through others, widely exhibited, advertised and sold his pole, and even in the earliest stage of its development ,the defendants were only some of various people who knew about the "secret".

On the contract phase of the case, the jury findings that the defendants agreed not to produce the pole for sale except for the plaintiff and that such agreement was not conditioned upon the plaintiff in effect making the defendants his sole source of manufacture of the pole, obviously were not complete findings as to just what the full agreement of both parties was. The holding of the court below purported to fill in this gap, stating in effect that by conclusive evidence the defendants' promise to produce only for the plaintiff "hinged on a reciprocal agreement and understanding that defendants were to manufacture fishing poles for plaintiff in production quantities for sale to the public." From this conclusion the court further held, "hence, upon plaintiff's failure to accord the defendants an order to manufacture the poles in production, the contract was at an end"—and the defendants accordingly free to make and sell these nonsecret poles for their own account.

While this view of the evidence is not extreme, our own

view is that the testimony of the plaintiff himself supports an implied finding by the trial court of a somewhat different transaction, that is, the abovementioned promise of the defendants given in return for the sample orders, the cash payment of the latter and the opportunity thereby afforded the defendants to obtain the substantial production orders the plaintiff might give. That the amount paid in connection with the sample work was only $190 is not conclusive against such an agreement, since it was a real consideration in itself and was accompanied by the perhaps more important consideration of placing the sample orders. Such an arrangement is not inherently improbable where a party thinks he has a novel idea of commercial value to himself. The testimony mentioned was in connection with the negotiations in which the sample orders were placed, and one of several similar portions of it reads: "They would make that pole exclusively for me and not anybody else, and if they didn't make the pole for me, that it was my pole and they wouldn't make it for anybody else." The implication of this is at variance with the idea that any obligation of the defendants "hinged on a reciprocal agreement" that the defendants were to get large production orders.

■ However, the existence of the contract or agreement not to make the article except for the plaintiff does not necessarily entail recovery by the latter. It is essentially the same as an agreement not to compete. Clearly it was in restraint of trade and therefore not enforceable if unreasonable in its terms. Restatement, Contracts, Secs. 513, 514. Restraint of trade unlimited as to both time and space are generally held to be unreasonable. See cases collected in 17 C.J.S. Contracts, Sec. 242. Here there is no limitation on either. There is not even a limitation to competition against the plaintiff. For aught that appears, the restraint would operate even though the plaintiff went out of business. Furthermore, since the plaintiff obviously did not, and in the nature of things could not, have similar agreements with even a substantial percentage of the countless other machinists in Texas and elsewhere that might well learn about his pole and legally duplicate it, no reasonable social interest appears to be served by allowing the plaintiff to restrict the defendants in so doing. And without prejudice to the legal validity of the consideration given by the plaintiff, its character bears unfavorably on the reasonableness of the restriction. While agreements not to compete have been enforced against persons employed on condition thereof or selling property to the plaintiff on the same condition, here the consideration for the agreement is not much more than a mere money payment,

and a relatively insignificant one at that. To enforce such an agreement appears to be at least doubtful policy. See Restatement, supra, Sec. 515(e) and Illustration at p. 995.

■ We agree with the view below that the record discloses no evidence of unfair competition in the sense of the defendants passing off their own poles as poles of the plaintiff.

■ On the other hand, under the circumstances, the defendants should not recover on the injunction bond. While the case is not one of those in which damages are said to be unavailable because the dissolved injunction had restrained the defendant from doing something that was illegal or that he had no right to do, (see Parks v. O'Connor, 70 Texas 377, 388, 8 S. W. 104, 107; Guthrie v. Biethan, 25 Idaho 706, 139 P. 718, 719) it may yet not require a recovery, if general equitable principles dictate otherwise. Recovery on the bond is "not a matter of right." Greenwood County v. Duke Power Co., 107 Fed. 2d 484, 489 (4th Cir.) cert. denied, 309 U. S. 667, 60 Sup. Ct. 608, 84 L. Ed. 1014. Though the agreement from which the injunction arose was unenforceable, it was yet an agreement based on consideration, and the defendants should not in equity be allowed damages for being restrained from doing what they had contracted not to do. This is all the more true in the light of the uncertain character of the damages—even as reduced by the "remittur". At the time the injunction was issued the defendants had not sold any poles. The award therefore rested on proof of profits made after the injunction was dissolved. The normal criterion for allowing this usually speculative item of recovery is that of an established record of profits made prior to the act which is the basis of damage claim. Southwest Battery Corp. v. Owen, 131 Texas 423, 115 S. W. 2d 1097.

The judgments of both courts below are reversed and judgment is here rendered that plaintiff take nothing by his suit and that the defendants take nothing by their cross action. Costs in this court are taxed against the defendants. All other costs are taxed against the plaintiff.

Opinion delivered May 30, 1951.

Rehearing overruled June 27, 1951.