**VENTURA MANUFACTURING COM-PANY, Appellant,**

v.

**Bruce M. LOCKE et al., Appellees.**

**No. 14858.**

Court of Civil Appeals of Texas, San Antonio.

April 22, 1970.

Rehearing Denied May 27, 1970.

**432**

Sawtelle, Goode, Troilo, Davidson & Leighton, John W. Davidson, Terry Topham, San Antonio, for appellant.

Theo F. Weiss, Clemens, Knight, Weiss & Spencer, San Antonio, for appellees.

BARROW, Chief Justice.

Ventura Manufacturing Company brought this suit to enjoin its former employee, Bruce M. Locke, his present employer, B. B. Saxon Company, Inc., and one of Saxon's employees, Charles M. Watkins, from the use of certain "trade secrets" acquired by Locke during his employment with Ventura. This appeal is from the denial of a temporary injunction after a nonjury trial.

In April, 1968, Lockheed Aircraft Corporation formed Ventura as a wholly owned, but autonomous Texas corporation to create hard-core employment. Lockheed's Georgia Division was in production of the C–5 airplane, which required the development of a new type fastener made of titanium to join the aircraft structure together. Thousands of fasteners of about 3000 different sizes and types are used in this large airplane and titanium is used because it is as strong as steel although as light as aluminum. Many of these fasteners identified as VSP (Valuable Small Part) drop to the floor while being attached and become mixed in the floor sweepings with other less valuable small parts and debris. These VSP are valuable if they can be economically salvaged in that they cost an average of forty-three cents each. Accordingly, Lockheed in July, 1968, made a contract with Ventura to separate, identify, clean and repackage these VSP for a contract price of six cents each. The floor sweepings are shipped from Georgia to San Antonio in 55-gallon drums and the repackaged VSP are returned to Georgia properly packaged and marked with a Lockheed stock number.

Locke retired from the Army in 1963 and was hired by Ventura from the Saxon Company in November, 1968, as an engineer. In May, 1969, he was placed in charge of its VSP process. At this time, Ventura was losing money on its VSP contract. Locke made certain refinements in the process such as use of machine cleaning in lieu of hand cleaning, and using produc-

tion line type programing. He also changed from handbrushing to the use of ultrasonic cleaners for removal of the epoxy glue which is on many of the VSP. The VSP process was largely developed on a trial and error basis and Ventura's president testified that about $35,000 was spent in developing its present process. The VSP contract was on a profitable basis by the time Locke quit Ventura in October, 1969. Locke testified that he quit to return to the Saxon Company because of a better personal opportunity and admitted that shortly after he went with Saxon, he had unsuccessfully solicited a contract from Lockheed-Georgia at a lesser price than was paid Ventura.

At the conclusion of the hearing, the trial court found that Ventura's VSP process was not a "trade secret" and therefore denied Ventura's prayer for a temporary injunction. The evidence established that the VSP were first separated from the other floor sweepings by a magnet and then were washed under heat in two chemicals by use of a household roaster. Finally, the fasteners were cleaned in an ultrasonic cleaner in a household detergent and dipped in a preservant before packing. Defendants urged that since each of these components was a common commercial product readily available on the open market, and that recognized assembly line techniques were applied, the process was not a trade secret.

The following definition of a "trade secret" from the American Law Institute Restatement of Law has been approved: "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. * * * 'A trade secret is a process or device for continuous use in the operation of the business. Generally, it relates to the production of goods, as, for example, a machine or formula for the production of an article." 4 Restatement of Law of Torts, § 757(b). See Hyde Corporation v. Huffines, 158 Tex. 566, 314 S.W.2d 763 (1958); K & G Oil Tool & Service Co. v. G & G Fishing Tool Service, 158 Tex. 594, 314 S.W. 2d 782 (1958); West v. Pennyrich International, Inc., 447 S.W.2d 771 (Tex.Civ. App.—Waco 1969, no writ). These cases hold that it is not essential that the process be subject to patent for it to be protected as a trade secret. Furthermore, the process or device may be a trade secret although defendant could have gained knowledge of same from a study of plaintiff's marketed product. The point is that he did not do so.

In Wissman v. Boucher, 150 Tex. 326, 240 S.W.2d 278 (1951) the Supreme Court held that the making of a combination fishing rod-walking stick did not involve a trade secret. "The subject matter of a trade secret must be secret. Matters of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret." In Luccous v. J. C. Kinley Co., 376 S.W.2d 336 (1964), the Supreme Court dissolved a temporary injunction enjoining defendant from unfairly using a trade secret where the record showed that plaintiff had elected to patent his sand-cutter, thus making same available for the benefit of the public. See also, Furr's Inc. v. United Specialty Advertising Co., 338 S.W.2d 762 (Tex.Civ.App.—El Paso, 1960, writ ref'd n. r. e.)

Our Courts have recognized the difficulty in determining whether a process or formula should be classified as a trade secret or a matter of general knowledge. In K & G Oil Tool & Service Co., supra, the Supreme Court said: "In the law of trade secrets, embracing mechanical engines, chemical formulae, confidential lists and the like, matters ranging from sugar in

tea for sweetening purposes to the most complicated machines will be encountered. Questions as to classification will arise and their solution may not always be free from difficulties. Examples may be more helpful than definition or attempted redefinition."

Classification of Ventura's VSP process is an excellent example of such difficulty. Obviously, the basic proposition involved in the cleaning of dirty parts by commercial detergents involves no trade secret. Also, the use of production line techniques as such must be considered as a matter of general knowledge. On the other hand, we cannot say that the details of the procedure followed in the cleaning of these fasteners are matters of general knowledge. To the contrary, the record demonstrates that such details as the types and amounts of chemicals to be used and the times and temperatures for cleaning the fasteners were developed by Ventura through extensive trial and error and at considerable expense.

Locke testified that he would not use the Ventura VSP process if Saxon Company secured a contract for salvaging VSP, and that his own process would be as different as "night from day." It would take him about 35 days to set up his process, but since no contract was obtained, he had not commenced to do so. Here, although Locke and Saxon Company would like to go into the business of cleaning VSP and have every right to do so, they were unable to secure such a contract. There is evidence that only Lockheed-Georgia Division uses titanium fasteners at the present time, and assuming that Saxon Company could successfully secure a contract despite the "parent-child relationship" between Ventura and Lockheed, it is doubtful that Saxon Company could successfully compete even with a lower price in view of the added expense to Lockheed in quality control should the VSP be repackaged by an independent company.

Ventura complains on this appeal of the trial court's refusal to permit it to cross-examine Locke as to the nature of his proposed process. We sustain this point. On another trial of this case, Ventura should be permitted to test Locke's denial of the use of the Ventura process by inquiry as to the process used by him. See Welex Jet Services, Inc. v. Owen, 325 S.W.2d 856 (Tex.Civ.App.—Fort Worth, 1959, writ ref'd, n. r. e.). In the absence of such evidence, it cannot be determined if the trial court abused its discretion in denying Ventura's application for a temporary injunction, because of the use or threatened use of any trade secret. See Sun Oil Company v. Whitaker, 424 S.W.2d 216 (Tex.Sup.1968); Texas Foundries, Inc. v. International Moulders & Foundry Workers' Union, 151 Tex. 239, 248 S.W.2d 460 (1952).

Locke signed an instrument entitled "Security and Assignment of Inventions Agreement" at the time he commenced work for Ventura. Section B thereof relates to the assignment of all improvements, inventions and discoveries made by him to Lockheed Aircraft Corporation. The term inventions as defined comprises any new and novel art, machine, manufacture, method, process, apparatus, composition of matter, design or configuration of any kind, conceived, made, produced or discovered or any improvements thereof. He further agreed to keep confidential all information pertaining to the company's business. Such agreement does not contain a covenant not to compete. There is no showing that Locke had made any invention which belongs to Lockheed under the agreement. Nothing in this agreement compels a finding that the trial court abused its discretion in not granting the temporary injunction.

The judgment of the trial court is reversed and the cause remanded.